OPINION JUDGMENT ENTRY
{¶ 1} Appellant Laci Kadri appeals from the August 4, 2003, Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, finding appellant to be a delinquent child.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 16, 2003, appellant was charged in the Tuscarawas County Court of Common Pleas, Juvenile Division, with being a delinquent child by virtue of having committed the offenses of burglary in violation of R.C. 2911.12(A)(3), a felony of the third degree, theft in violation of R.C. 2913.02(A)(1), a felony of the fifth degree, and receiving stolen property in violation of R.C. 2913.51, also a felony of the fifth degree. At her arraignment on July 22, 2003, appellant denied the charges set forth in the complaint.
 {¶ 3} Thereafter, an adjudicatory hearing was held on July 31, 2003. The following testimony was adduced at such hearing.
 {¶ 4} Donna Jo Moody is the mother of Melinda Zurcher, who is friends with appellant. While Moody resides with her husband and son at a residence in Dennison, Ohio, Zurcher resides with her father. Moody testified that Zurcher, who does not have a key to the Moody residence, does not have permission to enter the same in Moody's absence because "[s]he's been in so much trouble and I just don't trust her." Transcript at 6.
 {¶ 5} At the hearing, Moody testified that on July 12, 2003, Zurcher telephoned her as Moody was getting ready to go to her son's ball game and asked Moody if she was still going to the game. Moody responded in the affirmative and Zurcher indicated that she might try to make it to the game. Moody also told Zurcher that Moody's husband was planning on attending. However, Zurcher never appeared at the game.
 {¶ 6} When Moody arrived home at approximately 8:10 p.m., she noticed from her front porch that a plastic strip that had been inside the window sill between the window and the screen was "laying across my ashtray on the brick ledge outside the screen." Transcript at 8. Upon entering her duplex, Moody discovered that locks to the exterior and interior basement doors were busted. Moody also discovered that $490 in cash that had been inside an envelope[1] in a china cupboard was gone. Moody later found out that approximately $10 in change was also missing from the house. On cross-examination, Moody testified that Zurcher would have known where the money was and that Zurcher told her that she took the money and that "Laci [appellant] was with her." Transcript at 13.
 {¶ 7} The next witness to testify was Shawn Moreland, who lives about four houses down from the Moodys on the same side of the street. Moreland testified that, on July 12, 2003, she noticed a dark car with a big flame on the side of it circling the street more than once sometime between 4:00 p.m. and 6:00 p.m. Moreland later saw the same car parked near the Moody residence on the same side on the street. According to Moreland, two girls and one boy got out of the car, went up on the porch and knocked on the door of the Moody residence and then on the neighbor's door. While one of the girls was tall, one was "a little girl." Transcript at 17. Appellant is 4' 11" and weighs one hundred pounds. Several days later, Moreland saw the same car at the Motel 6 where she works. Moreland testified that, on such day, she checked a boy by the name of Charles McIntyre into the motel and that she saw appellant with McIntyre. When questioned, Moreland testified that appellant was about the same height as the "little girl" who she saw on the Moody's porch.
 {¶ 8} Melinda Zurcher, Donna Jo Moody's daughter, testified at the hearing that she did not have a key to her mother's house and was not allowed in the same if her mother was not present. Zurcher further testified that she knew both appellant and Charles McIntyre, that she was with both of them on July 12, 2003, and that she was in McIntyre's vehicle on such date. Zurcher also testified that "[t]here was no time whatsoever that all three people were outside of the car" in front of the Moody residence. Transcript at 30. However, when questioned further about the events of July 12, 2003, Zurcher pleaded the Fifth Amendment. The trial court then found that Zurcher had properly asserted her privilege against self-incrimination and declared Zurcher an unavailable witness under Evid.R. 804(A)(1).
 {¶ 9} The next witness, Charles McIntyre, testified that he was good friends with appellant, but that the two were not romantically involved, and that he owned and was driving a black car with a flame decal on the side in July of 2003. McIntyre, during questioning, admitted speaking with Patrolman Todd Beeman. However, after McIntyre refused to answer any other questions, the trial court found that he had properly asserted his privilege against self-incrimination and declared McIntyre an unavailable witness under Evid.R. 804(A)(1).
 {¶ 10} The State next called Patrolman Todd Beeman of the Dennison Police Department to the stand Patrolman Beeman testified that, on July 12, 2003, he received a burglary complaint from the Moody's and went to the Moody residence to investigate. Patrolman Beeman testified that the information that Donna Jo Moody, Melinda Zurcher's mother, relayed to him on such date was consistent with her trial testimony. After speaking with the Moodys on July 12, 2003, the Patrolman inspected the premises and discovered "two doors inside the residence that had been forcibly entered into." Transcript at 41. While one door was an exterior door, the other was an interior door. According to the Patrolman, "a certain amount of physical force" had to be used to break the doors. Transcript at 41. During his inspection, the Patrolman also found a crumbled up envelope on a barrel outside of the residence.
 {¶ 11} Several days after the incident, Patrolman Beeman had an opportunity to speak to Melinda Zurcher. Before speaking with Zurcher, he read her her Miranda rights. When Patrolman Beeman was asked whether Zurcher had told him what occurred on July 12, 2003, appellant objected, arguing that "the use that I expect to be made of this particular testimony would unduly restrict, unconstitutionally restrict Ms. Kadri's right of effective cross examination concerning what those two had to say." Transcript at 44. The trial court, however, overruled the objection, stating, in relevant part, as follows:
 {¶ 12} "All right. Well, the foundational requirements under 804 indicate that we must have unavailable declarant, which I think that we do, declarant must have first hand knowledge as contemplated under Rule 602, the nature of the statement must be such that a reasonable person would not have uttered it unless he or she believed it to be true, the statement must be contrary to pecuniary, propriety or penal interest at the time of the utterance and where the statement is one against penal interest which either inculpates or exculpates the accused in a criminal trial, there must be a corroboration tending to guarantee the statement's truthfulness.
 {¶ 13} "Obviously, I don't know exactly what he is going to testify to, but for right now, I'm going to overrule the objection and if I have something that comes up that's contrary to this, then of course we can strike it from the record. So you can answer the question." Transcript at 44-45.
 {¶ 14} Patrolman Beeman then testified, over objection, that Melinda Zurcher indicated to him that she was involved in the burglary and that both appellant and McIntyre were also present. The Patrolman testified that Zurcher told him that, on the day in question, the three circled the block several times in McIntyre's black Escort with red flames and that, after exiting the same, both Zurcher and appellant knocked on the door at the Moody residence and also next door. Patrolman Beeman further testified that Zurcher told him that "they had forcibly entered the residence, herself and Laci Kadri" and that "her and Laci had taken the money out of the China cabinet that was located in a bank book." Transcript at 46. According to the Patrolman, Zurcher told him that the three of them had spent the money, which Zurcher indicated totaled $500, on a room at the Holiday Inn, to pay off a $200 drug bill, and to purchase drugs and alcohol. Patrolman Beeman testified that Zurcher "did advise that she gave Laci Kadri and Charles McIntyre a certain amount of money to obtain a room. . . ." Transcript at 48.
 {¶ 15} At the hearing, Patrolman Beeman also testified that he spoke with Charles McIntyre and read him his Miranda rights. McIntyre told the Patrolman that he had been at Meghan Boswell's house earlier the same day with appellant and that they had picked up Zurcher. McIntyre, according to Patrolman Beeman, indicated that there was a discussion between Zurcher and appellant concerning obtaining money from Zurcher's mother's residence. McIntyre informed the Patrolman that the three circled the block in McIntyre's car and that appellant and Zurcher later exited the car and knocked on the door at the Moody residence and the neighbor's residence. The following is an excerpt from the Patrolman's testimony at trial:
 {¶ 16} "Mr. McIntyre did state that they walked around the side of the residence, came back to the vehicle and then left because he was hungry so they went, he went and got something to eat. When I asked Mr. McIntyre if they came back, he informed me that they did, they had circled around the block again and actually parked in the rear of the residence. Mr. McIntyre informed me that Ms. Kadri and Melinda Zurcher had exited the vehicle and sat on the back porch as to act as nothing was going on. He states that Ms. Kadri walked around the side of the house, had came back to his car laughing and giggling and saying how she had broken a window and advising him to move his vehicle up over by the garage to where it would be less conspicuous. At that point, he could not view any contents but Mr. McIntyre had advised me that they had, Ms. Kadri had went back up to the residence with Ms. Zurcher and a short time later, they came back, they were laughing and giggling in a very happy state saying how they just kicked in the doors and stolen five hundred dollars. Mr. McIntyre advised me that they had entered his vehicle and they had started counting the money inside the back of his vehicle. And at that point, they had left and went to New Phila[delphia] and rented a motel room." Transcript at 50-51. McIntyre further advised Patrolman Beeman that a total of $500 was taken and that they used approximately $180 of such money for a Jacuzzi suite at the Holiday Inn and the rest on alcohol and drugs.
 {¶ 17} During cross-examination, the Patrolman testified that he did not record his conversations with Zurcher and McIntyre because "[t]here was no access to it, any blank tapes at that time." Transcript at 57.
 {¶ 18} At the July 31, 2003, hearing, Kasey Parrish testified that he knew appellant, Charles McIntyre and Melinda Zurcher and that he was at a Holiday Inn in July of 2003 with the three and with Meghan Boswell, among others. According to Parrish, while at the hotel, he heard appellant bragging about kicking in the door to the Moody residence with Zurcher and stealing $500 from a cabinet. Parrish testified that Zurcher, who appeared to be stressed out, paid for the hotel room. In turn, Meghan Boswell, who also knew all three, testified that in mid July of 2003, appellant and McIntyre picked Zurcher up from Boswell's residence. Later the same day at the Holiday Inn, appellant told Boswell that "they [appellant, McIntyre and Zurcher] broke into Melinda's mom's house and . . . stole the money . . ." Transcript at 85. The following is an excerpt from Boswell's testimony at the hearing:
 {¶ 19} "She [appellant] told me they went to Melinda's mom's house and when they got to the door, they went to push the door open or whatever and the door was locked and then she pushed at the bottom of the door and it budged a little bit so she kicked in the door. They went in the house, somebody touched a box, I think it was Laci, but it didn't have anything in it. And then Laci opened the cupboard where the money was but Melinda took the money and then they left, to my knowledge." Transcript at 86. Boswell further testified that appellant told her that they had taken $500.00.
 {¶ 20} According to Boswell, who admitted to drinking while at the hotel, the next day, appellant came over to Boswell's house and "told me in more detail what happened." Transcript at 87. Boswell, who testified that she was sober on such day, testified that appellant told her that she was the one who had kicked in the door to the Moody residence, that she had gone into the same with Zurcher, and that she opened the cupboard and Zurcher had removed the money. Boswell testified that appellant provided her with the same information as the night before, except in more detail.
 {¶ 21} After the State rested, appellant testified on her own behalf. Appellant, during direct examination, denied kicking in the door to the Moody residence on July 12, 2003, and entering the same and denied participating in the burglary. Appellant, who also denied telling Meghan Boswell that she had participated in the burglary, testified that she had told Boswell "what Melinda [Zurcher] had done." Transcript at 92. However, appellant admitted going to the Moody residence with Melinda Zurcher and Charles McIntyre on July 12, 2003. Appellant testified that they went to the Moody residence after Zurcher told them that her mother had left the door unlocked so that Zurcher could go in and get her money and some of her clothes. Appellant also denied telling Kasey Parrish that she had gone into the Moody home and denied discussing with Meghan Boswell the next day what had happened at the Moody home.
 {¶ 22} On cross-examination, appellant admitted that she was gone from July 6, 2003, until at least July 15, 2003, and that, during such time, she was staying with Meghan Boswell. Appellant also admitted that, on July 12, 2003, she was with Charles McIntyre and was in his car, that the two of them picked up Zurcher and then drove to the Moody residence and drove around the same once. Appellant also admitted that she was at the Holiday Inn and that both Parrish and Boswell were there and that, the day after the burglary, she went to Boswell's house. Appellant testified that Moreland, Boswell and Parrish were all lying.
 {¶ 23} At the conclusion of the hearing, the trial court found that appellant had committed the offenses alleged in the complaint and found appellant to be delinquent. As memorialized in a Judgment Entry filed on August 4, 2003, the trial court sentenced appellant to two consecutive six months commitments in the Ohio Department of Youth Services.
 {¶ 24} It is from the trial court's August 4, 2003 Judgment Entry that appellant now appeals, raising the following assignments of error:
 {¶ 25} "I. Permitting a police officer to testify about hearsay assertions of witnesses who have asserted their fifth amendment privilege, which alleged assertions incurpated [sic] A juvenile defendant and were not tape recorded, violates the constitutional confrontatiion [sic] rights of the juvenile defendant, under the particular facts of this case, and was error.
 {¶ 26} "II. Absent the inadmissable evidence of the out-of-court hearsay declarations of zurcher and mcintyre the evidence was insufficient to sustain the court's finding."
I, II
 {¶ 27} Appellant, in her first assignment of error, argues that the trial court erred in permitting Patrolman Beeman to testify about hearsay statements of co-defendants Melinda Zurcher and Charles McIntyre, who had asserted their Fifth Amendment privilege against self-incrimination. Appellant specifically contends that the trial court erred in permitting the Patrolman to testify regarding what Melinda Zurcher and Charles McIntyre allegedly told him about the events of July 12, 2003, which inculpated appellant, when their statements to the Patrolman were not tape recorded. In her second assignment of error, appellant maintains that, absent such alleged hearsay testimony, there was insufficient evidence to sustain the trial court's finding that appellant was a delinquent child.
 {¶ 28} We find that it is unnecessary to address the merits of appellant's first assignment of error since, even absent the allegedly hearsay testimony, there was sufficient evidence supporting the trial court's delinquency finding. When reviewing a challenge of the sufficiency of the evidence, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 29} As is stated above, the complaint in the case sub judice alleged that appellant had committed burglary in violation of R.C. 2911.12(A)(3), theft in violation of R.C. 2913.02(A)(1) and receiving stolen property in violation of R.C. 2913.51. R.C.2911.12 states, in relevant part, as follows: "(A) No person, by force, stealth, or deception, shall do any of the following: . . . (3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense;" R.C. 2913.02 provides, in pertinent part, as follows: "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: . . . (1) Without the consent of the owner or person authorized to give consent;". Finally, R.C. 2913.51(A) states that"[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense"
 {¶ 30} Appellant specifically contends that there was insufficient evidence supporting the trial court's delinquency finding since there was no physical evidence implicating appellant and since appellant never confessed, but rather denied any participation in the crimes. We, however, disagree. At the hearing in this matter, evidence was adduced that the door to the Moody's house was forcibly kicked in on July 12, 2003, and that approximately $500 was taken from the house. As is stated above, Shawn Moreland, the Moody's neighbor, testified that on July 12, 2003, she saw a dark colored vehicle with a big flame on the side circling the street. Moreland testified that she saw three young people get out of the car and knock on the Moody's door. While one of the two girls Moreland saw was tall, the other "one was a little girl". Transcript at 17. Appellant is 4' 11" tall and weighs one hundred pounds. The other two individuals matched the descriptions of Melinda Zurcher and Charles McIntyre.
 {¶ 31} At the hearing, appellant herself admitted that, on July 12, 2003, she was with Charles McIntyre and Melinda Zurcher in front of the Moody's house in McIntyre's car, which is dark colored and has a flame decal on the side. Appellant also admitted that later the same evening, she was at the Holiday Inn with Meghan Boswell and Kasey Parrish. Parrish testified that, while at the hotel, he heard appellant bragging about kicking in the door to the Moody residence with Zurcher and stealing $500 from a cabinet. Appellant, during cross-examination, testified that McIntyre paid for the room using $180 that Zurcher had given him. In addition, Meghan Boswell, with whom appellant had been staying prior to the incident, testified that on both July 12, 2003, and the next day, appellant told her that appellant had broken into the Moody residence with Melinda Zurcher and that they had taken $500. In short, based on the above evidence, we find that any rational trier of fact could have found that appellant committed the offenses of burglary, theft and receiving stolen property.
 {¶ 32} Appellant's second assignment of error is, therefore, overruled. Appellant's first assignment of error is, therefore, moot.
 {¶ 33} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, finding appellant to be a delinquent child is affirmed.
Judgment affirmed.
Farmer, P.J., and Wise, J., concur.
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas Juvenile Division is affirmed. Costs assessed to appellant.
[1] The money was in a bank book that was inside the envelope.